John C. Taylor and Evelene B. Taylor v. Commissioner.
Taylor v. Commissioner
Docket No. 63939.
United States Tax Court
T.C. Memo 1960-105; 1960 Tax Ct. Memo LEXIS 181; 19 T.C.M. (CCH) 563; T.C.M. (RIA) 60105; May 27, 1960
*181 1. In 1925, petitioner purchased one-half of the stock in Publishing Company for $12,500 cash and capital contributions of $2,500 arising out of prior advances. Actual delivery of the stock was not made until 1927. Held: Petitioner's cost basis for the stock is $15,000. 2. Petitioner claimed an interest in a certain radio enterprise, and in 1950 brought suit based on such claim along with another suit to protect his interest in Publishing Company. Petitioner, in 1951, received $420,000 from Publishing Company in exchange for his stock and released all claims against the parties involved in the suit against Publishing Company, which included the individual defendant named in the radio enterprise suit. Petitioner and his attorneys allocated $95,000 to settlement of the radio claim in order to fix attorneys' fees. Petitioner also allocated $20,000 as his share of the retained profits of the radio enterprise. Held: That the entire $420,000 was attributable to the sale of stock to Publishing Company as settlement of the suit involving his interest in Publishing Company, and that no sum was attributable to the radio claim. 3. Petitioner received, in addition to the $420,000 cash from *182 Publishing Company, satisfaction of a debt due Publishing Company in the sum of $12,112.30. Held: The total sales price of his stock was $432,112.30. 4. Petitioners itemized their deductions and deducted state income taxes of $15,650 paid in 1951 in determining their net income. Petitioners now seek to capitalize this tax item and treat it as an expense of the stock sale. Held: That income taxes are not "taxes" for the purpose of the statutory provision permitting capitalization. Regs. 111, sec. 29.113(b)(1)-1. J. Alex Neely, Jr., Esq., 121 Sharpe Street Building, Anderson, S. C., for the petitioners. Miller Bowen, Esq., for the respondent. FISHER
Memorandum Findings of Fact and Opinion FISHER, Judge: This case involves a deficiency in income tax determined by respondent for the year 1951 in the amount of $20,016.58. The issues involved are: (1) What was the correct cost basis of petitioner's stock in the Independent Publishing Company; (2) whether petitioner received any money allocable to a claim that he owned a 50 per cent interest in a certain radio enterprise; (3) what was the sale price of petitioner's stock in the Independent Publishing Company and *183 (4) whether state income tax can be capitalized and classed as an expense of selling petitioner's shares in the Independent Publishing Company. Findings of Fact The stipulated facts are so found. Petitioners, John C. Taylor and Evelene B. Taylor, are husband and wife, residing in Anderson, South Carolina. Their joint return for the taxable year 1951 was filed with the then collector of internal revenue, Columbia, South Carolina. John C. Taylor, hereinafter referred to as petitioner, is a businessman and an attorney. In 1920 he returned to Anderson, South Carolina, after attending the University of South Carolina Law School and was elected Clerk of the Court, Anderson County, South Carolina. He held this office until 1932 when he was elected to the United States Congress. In 1920 and 1921, Wilton E. Hall, hereinafter referred to as Hall, worked as a reporter on the Anderson Daily Tribune, hereafter referred to as the Tribune, a newspaper published by V. B. Cheshire. After V. B. Cheshire died, Hall served as editor of the Tribune until 1923 when he became news editor of the Greenville News, Greenville, South Carolina. Hall remained with the Greenville paper until 1924. Hall *184 became acquainted with petitioner in 1920 during petitioner's campaign for Clerk of the Court. Independent Publishing Company In February 1924, Hall and Albert T. Hawkins, as partners, began publishing a semi-weekly newspaper called the Anderson Independent, hereafter referred to as the Independent. This paper became a daily morning newspaper in July 1924 and has continued to date as a daily. In September 1924, Hall acquired Hawkin's interest in the Independent and became its sole owner. After the death of V. B. Cheshire in 1921, the Tribune was owned and published by his estate, of which Cheshire's widow was administratrix. Cheshire's son and Mrs. Cheshire's second husband operated the Tribune for the estate. In the early fall of 1924, Hall and Louie L. Morris learned that the Tribune was for sale. Morris was interested in combining the Tribune and the Independent. Morris and Hall negotiated for the purchase of the Tribune and determined that although the asking price was $25,000, the paper could be bought for $20,000. Petitioner had no part in the negotiations with respect to the purchase of the Tribune. On February 24, 1925, Hall and Morris filed an application with the *185 Secretary of State of the State of South Carolina for a charter of incorporation of the Independent Publishing Company, hereinafter referred to as Publishing Company. This charter was granted on February 24, 1925, with authorized capital stock of $30,000, consisting of 300 shares of $100 par value stock. The charter was not recorded in the Anderson County Court House until November 3, 1925, when it was recorded with certain amendments requested by petitioner and concurred in by Hall. For all practical purposes, at that time, any interest on the part of Morris had terminated and petitioner and Hall were equal owners of Publishing Company. No stock had then been issued. The purpose of incorporating Publishing Company was to effect a merger of the two morning newspapers, the Independent and the Tribune. The Independent was transferred to Publishing Company to satisfy Hall's $15,000 stock subscription. At that time the Independent had a circulation of about 3,000. On February 27, 1925, Cheshire's widow, as administratrix of his estate, petitioned the Probate Court, Anderson, South Carolina, for an order directing her to sell the Tribune to Publishing Company for $20,000, of which *186 $12,500 was to be paid in cash and the remaining $7,500 of the purchase price to be secured by a mortgage on the entire plant of the Tribune. The court entered an order on the same day authorizing and directing the administratrix to sell the Tribune to Publishing Company at the price and terms set forth in her petition. On or about May 1, 1925, Publishing Company purchased the Tribune from the Cheshire estate in accordance with the decree of the Probate Court. Publishing Company merged the Independent and the Tribune into one newspaper. At the time of the merger the Tribune had a paid circulation of about 1,000. Hall believed that at least one-half the purchase price of the Tribune was for its Associated Press franchise. Prior to May 1, 1925, petitioner paid in $12,500 to Publishing Company for stock to be issued to petitioner. Morris had decided not to purchase the shares for which he had subscribed. This $12,500 was used by Publishing Company to purchase the Tribune. No stock was issued to petitioner at this time. Publishing Company gave the Cheshire estate $7,500 in notes secured by a chattel mortgage on the equipment of the Tribune for the unpaid balance of the purchase price. *187 The mortgage was recorded in the office of the Clerk of the Court, Anderson, South Carolina, on February 28, 1925. The notes were satisfied in full on August 12, 1927, which fact is noted on the face of the mortgage. Stock of Publishing Company was issued to petitioner and Hall as follows: Number of
Number of
Date
Shares to Petitioner
Shares to Hall
1-25-27
145
30
5-28-30
115
7- 5-30
5
5
Total
150
150 There was no change in stock ownership from 1930 through 1950 other than one share which was sold by Hall to Bessie P. McDaniel to qualify her as secretary of Publishing Company. In addition to the amount of $12,500 which petitioner paid into Publishing Company, petitioner, through the medium of advances, made capital contributions of $2,500, and the total of $15,000 completed payment of petitioner's stock subscription. Petitioner loaned Hall $1,000 in 1923, which was repaid in 1928, at eight per cent compound interest. This loan was entirely personal and was not a capital contribution to Publishing Company. Petitioner left the management of the newspaper and its policy decisions to Hall. Radio Enterprise On November 18, 1930, Publishing *188 Company applied to the Federal Communications Commission for a construction permit to construct and operate a radio station in Anderson. After a hearing, this application was denied on May 29, 1931. Thereafter, B. T. Whitmire of Greenville, sought a permit to build and operate a radio station in Anderson. The Independent agreed to exchange advertising space in the paper for advertising time on Whitmire's radio station. Publishing Company later decided not to go through with this arrangement and Whitmire abandoned his efforts to establish the station. Hall then paid Whitmire for the expenses incurred by Whitmire, and on October 23, 1934, Hall, as an individual, applied to the FCC for a permit to construct and operate a radio station in Anderson. This permit was granted by the FCC on April 30, 1935. In a letter to the FCC dated December 12, 1934, Hall stated: "Should the station not be self-sustaining at the start, our newspapers here (which showed a net profit last month of more than $5,000.00) will arrange such programs for their own advertising, and purchase such time as needed to carry on the station on a satisfactory financial basis." This statement was reiterated by Hall *189 in a letter to the FCC dated March 15, 1935. From 1945 through 1948, petitioner corresponded with Hall asking him to establish as a matter of record, petitioner's alleged one-half interest in the radio station. At no time did Hall admit that petitioner owned an interest in the radio station. Subsequent to this correspondence, and at the trial of this case, Hall denied that petitioner had any interest in the radio business. The above-mentioned correspondence includes the following: On November 18, 1944, petitioner asked Hall to take steps necessary to make petitioner's interest in the radio station a matter of public record. Hall responded, stating: "Your suggestion meets with my hearty approval. I will do my best before the end of December to work out a proposal that will bring the whole matter to a satisfactory conclusion." On May 18, 1945, and June 3, 1945, petitioner, in letters to Hall, repeated his request for recording petitioner's claimed interest in the radio station. Other notes from Hall to petitioner are noncommital as to ownership, but request further time in which a Washington attorney, specializing in radio matters, could work out some undisclosed details. *190 A letter from Hall to petitioner postmarked May 20, 1947, stated: "The auditor finally got over here and completed his work sheet. In a week or two we should have all the data showing tax costs and so forth that we will have to pay under incorporation plans for the WAIM and then we can proceed. Corporation taxes should be lowered soon, maybe. The people have approached me recently to inquire if we will sell. It is certainly a good time to sell. There will be only limited relief from war taxes in our days and already the unifications scare is starting again. Before winter sets in what do you think of the idea of putting a genuine asphalt rock roof on the building? This is the type used as absolutely flat roofs and they will not leak if water stands on them. We will be in for trouble this fall and winter unless leaks are stopped. Another drainpipe will not mend the leaks. Will be glad for the company to stand part of the cost or all of it if it doesn't run too high. "We are installing a sprinkler system. This will substantially reduce insurane on building and contents. Be sure to check with the insurance company to take advantage of this saving. We will save a big portion of this *191 installation in the premium, not to mention the protection. If we were to have a fire, loss of circulation revenue alone would amount to more than the sprinkler system. "There are two local applications for a new station and I hear confidentially soon to be filed. After we incorporate I may file for one personally, as both of my boys are interested in electronics. The policy will be to license new ones right and left. FM application is in good shape Spearman reports. In order to tie in with facsimile broadcasting so a newspaper can be transmitted (the next step in newspaper business) the cost will run from forty-eight thousand to sixty thousand. We will have to borrow and build all over again. "When you have time would like to discuss these and other matters with you." In December 1950, petitioner instituted a suit in the Court of Common Pleas, County of Anderson, against Hall, the Independent Publishing Company, and Bessie P. McDaniel, requesting in addition to other relief, that an accounting of the profits be had and that a receiver be appointed to operate and liquidate the Publishing Company. At the same time, petitioner also instituted a suit against Hall in the same court, *192 requesting in addition to other relief, that petitioner be adjudged one-half owner in WAIM and all businesses that were the outgrowths of WAIM; that Hall be made accountable to petitioner for one-half of the profits of the radio station and all businesses growing therefrom; that petitioner receive a judgment in that amount; and that a receiver be appointed to operate and liquidate the business. Prior to the trial of these suits, Publishing Company purchased petitioner's 150 shares as treasury stock for $420,000 in cash; and cancelled certain receivables owing to it by petitioner (to be referred to infra). The suits were dismissed upon execution by the parties of the following release: "This indenture made this 14th day of September, 1951, between John C. Taylor, of the one part, and Wilton E. Hall, Independent Publishing Company, and Bessie P. McDaniel, of the other part, witnesseth that each of them, the said John C. Taylor and the said Wilton E. Hall, Independent Publishing Company, and Bessie P. McDaniel, hereby releases the other of them, and each of the others of them, their, his, her, and its executors, administrators, successors, and assigns, from all sums of money, accounts, *193 contracts, agreements, actions, suits, proceedings, claims, and demands whatsoever which either of them or any one or two or three of them, the said John C. Taylor, Wilton E. Hall, Independent Publishing Company, and Bessie P. McDaniel, at any time had or now has against the other or others or either or any of the others of them for or by reason or in respect of any act, cause, matter, or thing whatsoever to the date of these presents. "In witness whereof the said parties have hereinto set their respective hands and seals on the day and year first above written. "Signed, sealed, and delivered in the presence of: (Sgd) J. Alex Neely, Jr. (Sgd) Leon W. Harris As to John C. Taylor (Sgd) Carolina Cromer (Sgd) S. Eugene Haley As to Wilton E. Hall Independent Publishing Company and Bessie P. McDaniel "(Sgd) John C. Taylor (Seal) (Sgd) Wilton E. Hall (Seal) Independent Publishing Company
By (Sgd) Wilton E. Hall Its President and Treasurer (Sgd) Bessie P. McDaniel (Seal)" The entire consideration was paid by Publishing Company. Petitioner had instructed his attorneys that he wanted $300,000 net to himself after payment of taxes and counsel fees. The method *194 used in arriving at this net figure made no difference to petitioner. Petitioner's attorneys' fees were based upon their own allocation (acquiesced in by petitioner) of the $420,000 received in cash. For the purpose of setting a fee, $95,000 of the $420,000 was attributed to settlement of the radio station claim. Such computation was made solely by petitioner and his attorneys and solely as a basis for calculating fees. Publishing Company treated the entire $420,000 (plus the cancelled account receivable referred to infra), as consideration for the purchase of petitioner's stock. Neither petitioner nor his attorneys ever had an accounting of the profits of WAIM or the businesses arising therefrom, but petitioner estimated that 15 or 20 per cent of the $95,000 he attributed to settlement of his claim on the radio station would be for profits and the remainder for good will and going concern value. On their 1951 joint income tax return, petitioners reported, under the schedule of long-term capital gains and losses, that in 1951 they had sold their "stock and interest in Independent Publishing Company" that had been acquired in 1925; that the cost or other basis of the stock was *195 $80,454; expense of sale, $25,350; and gross sale price of $420,000, leaving a gain of $314,196. Attached to the return was the following statement concerning the transaction: "John C. Taylor Sale of Stock "Taxpayer found it necessary to bring a suit in order to protect an investment in stock in a newspaper. In 1925, taxpayer had acquired a newspaper, known as the Tribune. He consolidated the Tribune with a newspaper, known as the Independent, which was operated by The Independent Publishing Company. He acquired in exchange for his newspaper, one-half (1/2) of the stock of The Independent Publishing Company, which had been capitalized at a par value of Thirty Thousand ($30,000.00) dollars. In 1925, the circulation of the Tribune was approximately thirty-five hundred (3500), and the circulation of the Independent was approximately thirty-one hundred (3100), giving a combined total circulation for the corporation of sixty-six hundred (6600). In 1930, a newspaper with a circulation of approximately forty-one hundred (4100) was sold for the sum of One Hundred Thousand ($100,000.00) dollars, making a price per circulation of Twenty-four and 38/100 ($24.38) dollars each. Taxpayer sold *196 his one-half (1/2) interest in the Independent Publishing Company for Four Hundred Twenty Thousand ($420,000.00) dollars. "Taxpayer's cost basis is the value of his stock just after the exchange in 1925 which is 1/2 the value of the new corporation. Its circulation was sixty-six hundred (6600) circulation at $24.38 making $160,908.00. One-half of this amount is $80,454.00." Sale Price of Publishing Company Stock During the course of operation, the Publishing Company traded advertising space in the Independent for merchandise, and if an advertiser owed it money, the Publishing Company would accept payment in merchandise. The two stockholders, Hall and petitioner, also received merchandise as individuals from the advertisers who would accept as payment advertising space in the Independent, or in payment thereof, would consent to reducing their indebtedness to the Publishing Company. The Publishing Company also paid personal liabilities on behalf of Hall and petitioner, such as cleaning, clothing purchases, auto purchases, household expenses, furniture purchases, and the like. The Publishing Company also paid for a portion of the advertising expenses of petitioner's campaigns for *197 election to Congress, and paid for advertising on WAIM of the Piedmont Roofing Company, of which the petitioner was a part owner. Such amounts "traded" by petitioner and Hall, or amounts paid on their behalf by the corporation were recorded on the books of Publishing Company as accounts receivable. The petitioner's account was labeled "John C. Taylor." When Publishing Company purchased petitioner's stock, his account was cancelled, and an entry was made to the cash journal on September 14, 1951, as follows: Miscellaneous
Debit
Credit
Special for stock pur-
chase
$420,000.00
John C. Taylor joint ac-
count
12,112.30
Treasury Account
$432,112.30 On the same date, the treasury stock account in the general ledger was debited by $432,112.30. Expenses of Stock Sale Petitioner filed a tentative income tax return with the State of South Carolina for the calendar year 1951 and paid the State of South Carolina $15,650. In their joint Federal income tax return for 1951 petitioners itemized their deductions and claimed $15,650 as a deduction for South Carolina income tax. In his deficiency notice, respondent determined that the sales price of petitioner's *198 Publishing Company stock was $432,112.33; the cost of the stock $12,500; and the expenses of sale $25,350, resulting in a long-term capital gain for 1951 of $394,262.33, rather than the $314,196 reported by petitioner on his 1951 return. Opinion Basis - Independent Publishing Company Stock Petitioner presents the following approach in support of his views in relation to the basis of his stock in Publishing Company. Petitioner purchased the Tribune from the Cheshire estate by putting up $12,500 in cash pursuant to an oral arrangement with Hall whereby Hall was to contribute $7,500 in cash when he was able to do so, at which time petitioner and Hall would become equal owners of the combined Independent and Tribune. Hall acted as petitioner's agent in the purchase of the Tribune and petitioner knew none of the details of the purchase agreement. Petitioner believed that the newspaper enterprise was being conducted subject to his informal agreement with Hall until he learned in October 1925 that Publishing Company was operating as a corporation. He then believed that the corporation would issue his stock in exchange for the Tribune when Hall had paid $7,500. Petitioner assumed *199 that he was a director of Publishing Company and did not attend any meetings for 23 years because he trusted Hall and his ability to run the paper. Petitioner accepted his Publishing Company stock in January 1927, in exchange for the Tribune, when he believed that Hall had virtually paid $7,500, which was the agreed condition precedent to establishing the combined newspaper enterprise. The Tribune had a fair market value of $80,454 when petitioner received his Publishing Company stock. Petitioner had made loans to Hall and had paid judgments against Hall totaling around $2,900 or $3,000. Hall's testimony is to the following effect: Hall and Hawkins operated the Independent as a partnership until September 1924, when Hall became its sole owner. Morris and Hall formed Publishing Company intending to merge the Independent and Tribune which they learned could be purchased for $20,000. Hall conveyed the Independent, which had a circulation of about 3,000 and a physical plant, to Publishing Company in satisfaction of his $15,000 stock subscription. Morris was unable to purchase the stock to which he had subscribed. Petitioner stepped into Morris' shoes and in May 1925, contributed $12,500 *200 in cash, which was used by Publishing Company as its cash payment in purchasing the Tribune. The Tribunte then had a paid circulation of about 1,000. Publishing Company gave the Cheshire estate a series of notes for $7,500, secured by a chattel mortgage on the Tribune plant, for the balance of the purchase price. Petitioner's capital contribution to Publishing Company was considered to be $15,000 since he had made loans to Hall and paid some judgments against Hall, which, together, totaled about $2,500 in addition to petitioner's $12,500 cash contribution. Stock was not actually issued until January 1927. Petitioner was never a director of Publishing Company. It appears, from our own findings, that Publishing Company's charter was issued on February 24, 1925, and that Publishing Company purchased the Tribune on or about May 1, 1925, for $12,500 cash and $7,500 in secured notes. Prior to the purchase of the Tribune, petitioner paid to Publishing Company $12,500 in cash (used by Publishing Company as the down payment on purchase of the Tribune) and was credited with a contribution to capital based on advances made by him, or a total of $15,000 for stock of Publishing Company to be *201 issued in the future. The fact that it was not actually issued at that time (145 shares being issued on January 25, 1927, and five shares on July 5, 1930) is of no significance here. Petitioner's 1951 Federal income tax return also indicates that petitioner acquired his interest in Publishing Company in 1925, and not in 1927. Respondent's determination is, of course, prima facie correct. He determined the cost to petitioner of Publishing Company stock to have been $12,500, which was the amount paid by petitioner in cash. Respondent does not now question the fact that an additional $2,500 is to be added to this cost as a contribution to capital by petitioner, and we need not, therefore, go into the somewhat confusing background to establish this factor. Thus, respondent's position is that the basis of the stock to petitioner was $15,000. We need only inquire, therefore, as to whether petitioner has established a foundation for a higher basis. We think it clear that he has not done so. Upon the facts, as we have found them, the merger of the two newspapers involved was effected in 1925, and a valuation in 1927 is not relevant. Moreover, as would be expected under the circumstances, *202 there is no acceptable evidence of a taxable transaction in 1927. Assuming arguendo that there was a taxable transaction in 1927 (which we do not find) the testimony adduced by petitioner does not convincingly establish the value which he urges. For completeness, we refer again to the $2,500 contribution to capital, the benefit of which petitioner will receive as an addition to cost of said stock. Petitioner testified that he loaned Hall $2,900 to $3,000. He admits that this is based entirely on recollection, and that he has no supporting record. Moreover, it is clear that $1,000 of this amount was a pure personal loan, having no relationship to the business of the newspaper, and, therefore, furnishing no foundation for adding from $400 to $500 as a further contribution to capital. In brief, petitioner acquired his Publishing Company stock for $15,000 represented by a cash payment of $12,500 plus $2,500, accepted by respondent to be a contribution to capital. Careful consideration of the entire record fails to establish a cost basis for the Publishing Company stock of more than $15,000, and we so hold. Allocation - Proceeds of Settlement, Radio Enterprise After Publishing *203 Company had been denied a license to operate a radio station in 1931, Hall applied for, and was granted the radio license in his individual capacity in 1935. Petitioner maintains that Publishing Company financed and built radio station WAIM and the businesses which arose therefrom and that petitioner and Hall were joint owners of the radio business. Hall maintains that he was sole owner of the radio enterprise from its inception, even though Publishing Company may have offered to support the radio station if such support were needed. In 1951 petitioner brought two suits. The first was against Hall, Publishing Company and Bessie P. McDaniel, to liquidate Publishing Company. The second was against Hall, individually, to establish petitioner's alleged one-half interest in the radio business. In addition to the cancellation of petitioner's indebtedness, to be discussed infra, petitioner received $420,000 which was paid by Publishing Company for petitioner's stock. Petitioner, Hall, Bessie P. McDaniel, and Publishing Company entered into a mutual release - "from all sums of money, accounts, contracts, agreements, actions, suits, proceedings, claims, and demands whatsoever which either *204 of them or any one or two or three of them * * * at any time had or now has. * * *" Petitioner and his attorneys, in setting attorneys' fees allocated $95,000 to settlement of the radio business claim. Petitioner contends that 15 to 20 per cent of this allocated amount is attributable to profits of the radio business and the remainder to going concern value and good will. Hall has testified that the radio business had over $40,000 in retained profits. Petitioner has apparently adopted this estimate of Hall's and claims that half of these profits were his. Hall maintains that none of the $420,000 is allocable to settlement of petitioner's claim on the radio business and that the correspondence exchanged between petitioner and Hall was in regard to petitioner's assertion that Hall's radio station was improperly competing with Publishing Company's newspaper, and also petitioner's desire to acquire an interest in the radio business. Petitioner's proposed allocations would result in $20,000 being treated as profits in settlement of the radio station claim and taxable as ordinary income rather than long-term capital gain. Under the circumstances of this case involving the use of the *205 alternative computation in relation to capital gains, and certain ordinary losses suffered by petitioner, but not requiring elaboration here, the treatment of the $20,000 as ordinary income rather than capital gain would be beneficial to petitioner from the tax standpoint for 1951. The allocations requested by petitioner are premised on the assumption that some of his $420,000 was received for releasing his radio station claim against Hall. The record clearly establishes, however, that the $420,000 was not paid by Hall, but was paid by Publishing Company for the purchase of petitioner's stock in that company. Moreover, there is no evidence that petitioner invested any capital in the radio enterprise or acquired any interest therein. While the correspondence between petitioner and Hall, and the testimony of each, is not as clear as it might be, it is consistent with the view that the radio enterprise was to be incorporated in the future, at which time petitioner was to be given the opportunity to "buy in." There is no evidence that such a transaction was even consummated, or even that there was any arrangement as to the amount of the consideration to be paid by petitioner for any *206 such interest if and when petitioner should acquire it. Moreover, petitioner appended to his 1951 Federal income tax return an explanation which specifically stated that the $420,000 was received for "his one-half (1/2) interest in the Independent Publishing Company." Upon careful review of the entire record, we have no doubt that no part of the $420,000 was allocable either to an interest in the capital or earnings of the radio enterprise. The mutual release merely took the precautionary and usual form of a complete and total termination of obligations, real or claimed, of each of the parties to the other. Even if we were to conclude that some part of the $420,000 was allocable to the radio enterprise, the amount of $95,000 selected by petitioner has no support in the record. Petitioner himself testified that he "had nothing to go on" and his attorney, who made the allocation with petitioner's acquiescence for the purpose of fixing legal fees in effect, admitted that he knew nothing about the books of the radio enterprise, or its net or gross income. In the light of the foregoing, we allocate no part of the settlement figure to the radio enterprise or to its earnings. Sale *207 of Publishing Company Stock Petitioner received $420,000 in cash for his shares of Publishing Company. Respondent contends that this should be increased by $12,112.30, due to satisfaction of a debt due Publishing Company in arriving at the proper sales price of his stock. Both petitioner and Hall agreed that Publishing Company paid certain obligations for them and that they received, as individuals, goods or services from debtors of Publishing Company in payment of such debt. Such items were charged on the books of Publishing Company as accounts receivable due by the respective stockholders. According to the testimony of Hall and Bessie P. McDaniel, the bookkeeper of Publishing Company, and as shown on the books of Publishing Company, petitioner's obligation was satisfied at the same time Publishing Company purchased petitioner's stock and it is clear that this was one of the effects of the mutual release. Whether or not petitioner knew the precise amount charged to his account, it is clear from his own testimony that he knew such charges were being made, and that he derived benefits from the items taken "in trade" and amounts paid out on his behalf. Petitioner questions some *208 of the items, but his testimony in relation thereto is not convincing. Respondent's determination of the amount to be added to the cash consideration in computing the total selling price of petitioner's stock is prima facie correct. We think it clear not only that petitioner has failed to meet the burden of proof of error in respondent's determination, but that the preponderance of the evidence supports respondent's position. See R. D. Walker, 34 B.T.A. 983 (1936). Since Publishing Company purchased all of petitioner's stock, and the evidence fails to justify any other treatment, the transaction gives rise to capital gain. Expenses of Stock Sale Petitioners, on their 1951 joint return, claimed $25,350 in expenses relating to the sale of Publishing Company stock. Respondent does not object to this. On the same return petitioners deducted $15,650 as income taxes paid the State of South Carolina during 1951. Petitioners now seek to have all or part of the $15,650 of state income capitalized and treated as part of the cost of selling the Publishing Company stock. This would be beneficial to petitioner in the instant case for reasons upon which we need not here elaborate. *209 State income taxes paid within the taxable year are deductible under section 23(c)(1) of the Code of 1939. Section 113(b)(1)(A), as construed and implemented by Regs. 111, sec. 29.113(b)(1)-1, permits an election to capitalize certain expenditures including "taxes" in determining adjusted basis, but is specifically inapplicable to expenditures for which deductions have been taken by the taxpayer in determining net income for the taxable year or prior taxable years. Moreover, Regs. 111, sec. 29.113(b)(1)-1 provide that the term "taxes," when used in relation to the election to capitalize, does not include income taxes. We think the regulations embody a proper construction and implementation of section 113(b)(1)(A) and preclude the capitalization of the state income taxes here involved. In view of our conclusion in this respect, we need not extend our discussion to the question of whether, in practical effect, a deduction for the income taxes in question was "taken" by petitioners in their 1951 return. Decision will be entered under Rule 50.